# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

PATRICK JAMES, THE PATRICK JAMES TRUST, ALBION REALTY LLC, ALESTER TECHNOLOGIES LLC, BATTERY PARK HOLDINGS LLC, BOND STREET ASSET MANAGEMENT LLC, IGNITE ACQUISITION HOLDINGS LLC, LARCHMONT LLC, PEGASUS AVIATION, LLC

       *Petitioners*,

v.

JEFFERIES FINANCIAL GROUP INC.

       *Respondent*.

Misc. Case No.:

Underlying Action:

*First Brands Group, LLC, et al., v. Patrick James, The Patrick James Trust, Albion Realty, LLC, Alester Technologies LLC, Battery Park Holdings LLC, Bond Street Asset Management LLC, Ignite Acquisition Holdings LLC, Larchmont LLC, Pegasus Aviation, LLC, John and Jane Doe(S) 1-100, and ABC Corporation(S) 1-100*, Adv. Proc. No. 25-03803 (Bankr. S.D. Tex.)

## PETITIONERS' MEMORANDUM OF LAW IN SUPPORT OF THEIR MOTION TO COMPEL JEFFERIES FINANCIAL GROUP INC. TO COMPLY WITH <u>PETITIONERS' SUBPOENA DUCES TECUM</u>

## <u>TABLE OF CONTENTS</u>

**Page**

INTRODUCTION ...................................................................................................................1

BACKGROUND .....................................................................................................................7

    A.    First Brands and the Chapter 11 Cases ................................................7

    B.    The So-Called "Third-Party Factoring" Arrangements ...........................8

    C.    The Adversary Proceeding.....................................................................10

    D.    The Subpoena.........................................................................................12

    E.    Jefferies' Refusal to Produce Any Document Beyond What It Produces Pursuant to the Debtors' Rule 2004 Requests to It.................................13

LEGAL STANDARD.............................................................................................................15

ARGUMENT ........................................................................................................................16

    A.    Jefferies Undeniably Possesses Relevant Information ........................16

    B.    The Court Has Personal Jurisdiction Over Jefferies ............................22

    C.    The Subpoena Presents No Undue Burden on Jefferies .......................22

CONCLUSION......................................................................................................................25

## <u>TABLE OF AUTHORITIES</u>

<u>Page</u>

### <u>Cases</u>

Anderson v. Steers, Sullivan, McNamar & Rogers,
998 F.2d 495 (7th Cir. 1993) ...................................................................................24

AP Links, LLC v. Russ,
299 F.R.D. 7 (E.D.N.Y. 2014) .................................................................................16

Avila v. Target Corp.,
2022 WL 17540322 (E.D.N.Y. Nov. 18, 2022)........................................................16

Citizens Union of City of N.Y. v. Att'y Gen. of N.Y.,
269 F. Supp. 3d 124 (S.D.N.Y. 2017).......................................................................16

Corp. v. United States,
32 Fed. Cl. 609 (1995) ..............................................................................................24

In re Cty. of Orange,
208 B.R. 117 (Bankr. S.D.N.Y. 1997).......................................................................23

Fireman's Fund Ins. Co. v. Great Am. Ins. Co. of N.Y.,
284 F.R.D. 132 (S.D.N.Y. 2012) ..............................................................................16

In re First Am. Corp.,
184 F.R.D. 234 (S.D.N.Y. 1998) ..............................................................................24

In re First Brands Group, et al.,
Ch. 11 Case No. 25-90399 (Jointly Administered) (CML) (Bankr. S.D. Tex.) ........1

In re First Brands Group, et al.,
25-90399 (CML) (Bankr. S.D. Tex.), Dkt. No. ........................................................5

In re First Brands Group, et al.,
25-90399 (CML) (Bankr. S.D. Tex.), Dkt. No. 22 ...................................................4

In re First Brands Group, et al.,
25-90399 (CML) (Bankr. S.D. Tex.), Dkt. No. 307 .................................................10

In re First Brands Group, et al.,
25-90399 (CML) (Bankr. S.D. Tex.), Dkt. No. 307-2................................................7

In re First Brands Group, et al.,
25-90399 (CML) (Bankr. S.D. Tex.), Dkt. No. 488 ..................................................2

In re First Brands Group, et al.,
    25-90399 (CML) (Bankr. S.D. Tex.), Dkt. No. 807 ..................................................8

First Brands Group, LLC, et al., v. Patrick James, et al.,
    25-03803 (CML) (Bankr. S.D. Tex.) ....................................................................8

First Brands Group, LLC, et al., v. Patrick James, et al.,
    25-03803 (CML) (Bankr. S.D. Tex.) ..................................................................11

First Brands Group, LLC, et al., v. Patrick James, et al.,
    25-03803 (CML) (Bankr. S.D. Tex.), Dkt. No. 108 ...............................................5

First Brands Group, LLC, et al., v. Patrick James, et al.,
    25-03803 (CML) (Bankr. S.D. Tex.), Dkt. No. 14 .................................................11

First Brands Group, LLC, et al., v. Patrick James, et al.,
    25-03803 (CML) (Bankr. S.D. Tex.), Dkt. No. 17 ..................................................4

First Brands Group, LLC, et al., v. Patrick James, et al.,
    25-03803 (CML) (Bankr. S.D. Tex.), Dkt. No. 18 .................................................11

First Brands Group, LLC, et al., v. Patrick James, et al.,
    25-03803 (CML) (Bankr. S.D. Tex.), Dkt. No. 19 ..................................................5

First Brands Group, LLC, et al., v. Patrick James, et al.,
    25-03803 (CML) (Bankr. S.D. Tex.), Dkt. No. 97 ..................................................5

Kirschner v. Klemons,
    99-CV-4828 (RCC), 2005 WL 1214330 (S.D.N.Y. May 19, 2005)..................22, 23

Licci ex rel. Licci v. Lebanese Canadian Bank, SAL,
    673 F.3d 50 (2d Cir. 2012).....................................................................................22

Nike, Inc. v. Wu,
    No. 13-CV-8012 (CM), 2020 WL 257475 (S.D.N.Y. Jan. 17, 2020) ....................24

Oppenheimer Fund, Inc. v. Sanders,
    437 U.S. 340 (1978)...............................................................................................16

In re Outpatient Med. Ctr. Emp. Antitrust Litig.,
    No. 21-CV-305, 2023 WL 4181198 (N.D. Ill. June 26, 2023)...............................23

Samsung Elecs. Co. v. Microchip Tech. Inc.,
    347 F.R.D. 252 (S.D.N.Y. 2024) ...........................................................................23

The Rockefeller Univ. v. Ligand Pharms.,
    581 F. Supp. 2d 461 (S.D.N.Y. 2008).....................................................................22

US Bank Nat. Ass'n v. PHL Variable Ins. Co.,
    No. 12-CV-6811, 2012 WL 5395249 (S.D.N.Y. Nov. 5, 2012)........................................23

Warnke v. CVS Corp.,
    265 F.R.D. 64 (E.D.N.Y. 2010) ..............................................................................16

## Rules / Statutes

8 Del. C. § 160 .......................................................................................................4

8 Del. C. § 174 .......................................................................................................4

11 U.S.C. § 542 ......................................................................................................4

11 U.S.C. § 544(b) ..................................................................................................4

11 U.S.C. § 548(a)(1)(A) ........................................................................................4

Bankruptcy Code Section 1104(c) ...........................................................................10

Del. Code § 1304(a)(1) ............................................................................................4

Del. Code § 1304(a)(2) ............................................................................................4

Fed. R. Civ. P. 12(b)(6) ...........................................................................................5

Fed. R. Civ. P. 12(e) ...............................................................................................5

Fed. R. Civ. P. 26(b)(1)......................................................................................15, 16

Fed. R. Civ. P. 45 .....................................................................................16, 22, 23, 24

Fed. R. Civ. P. 45(d)(2)(B)(i) ...............................................................................22

Ohio Rev. Code Ann. § 1336.04(A)(1)......................................................................4

Ohio Rev. Code Ann. § 1336.04(A)(2)......................................................................4

Fed. R. Civ. P. 26 ..................................................................................................15

Fed. R. Civ. P. 26(b)(1).........................................................................................16

United States Code Title 11 Chapter 11 ....................................1, 4, 7, 9, 12, 13, 14, 17

## Other Authorities

Bankruptcy Rule 2004 ............................................................................................2

Black's Law Dictionary (12th ed. 2024).....................................................................8

Petitioners Patrick James and the "Related Entities," *i.e.*, (a) The Patrick James Trust, (b) Albion Realty, LLC, (c) Alester Technologies, LLC, (d) Battery Park Holdings LLC, (e) Bond Street Asset Management LLC, (f) Ignite Acquisition Holdings LLC, (g) Larchmont LLC, and (h) Pegasus Aviation LLC (together with Patrick James, "**Petitioners**") initiate this miscellaneous case before the United States District Court for the Southern District of New York (the "**Southern District of New York**") and file this motion (the "**Motion**") to compel compliance with the subpoena <u>duces tecum</u> (the "**Subpoena**") served December 2, 2025 on Respondent Jefferies Financial Group Inc. ("**Jefferies**"[1]), and as **Exhibit 1** to the Declaration of James Tecce in Support of the Petitioners' Motion to Compel (the "**Tecce Decl.**").

## INTRODUCTION

The Petitioners' application to the Southern District of New York relates to bankruptcy cases commenced between September 24 and September 28, 2025 under chapter 11 of title 11 of the United States Code by First Brands Group and its affiliated debtors and debtors in possession ("**First Brands**," "**Company**," or "**Debtors**") and a related adversary proceeding the Debtors brought against Petitioners, both pending before the United States Bankruptcy Court for the Southern District of Texas (the "**Bankruptcy Court**"). The chapter 11 cases bear the caption <u>In re First Brands Group, et al.</u>, Ch. 11 Case No. 25-90399 (Jointly Administered) (CML) (Bankr. S.D. Tex.) (the "**Chapter 11 Cases**"), and the adversary proceeding bears the caption <u>First Brands Group, LLC, et al. v. Patrick James, et al. (In re First Brands Group, et al.)</u>, Adv. Proc. No. 25-

---

[1]    Jefferies also owns Leucadia Asset Management, LLC, Point Bonita Capital, LAM Trade Finance Group LLC, LAM Trade Finance Group I SPV LLC, and LAM Trade Finance Group II LLC (each a "**Jefferies' Affiliated Entity**," and together, the "**Jefferies Affiliated Entities**") each of which was served with a subpoena *duces tecum* with identical document requests by Patrick James and the Related Entities at their respective addresses in Delaware. On December 23, 2025, Jefferies confirmed, through counsel that it is in possession, custody, and control of the documents of each of these subpoenaed Jefferies' Affiliated Entities, Petitioners' Motion to Compel Jefferies' production in this Court, if ordered, will in effect allow Petitioners discovery into any of the Jefferies' Affiliated Entities under Petitioners' respective subpoena to each of them.

3803 (CML) (Bankr. S.D. Tex.) (the "**Adversary Proceeding**").  The Southern District of New York is the proper venue for Petitioners' Motion because it is where Jefferies is located and where the Subpoena requests compliance.

Petitioners require judicial intervention.  Jefferies initially responded to Petitioners' Subpoena on December 16, 2025, with general, blanket objections and an outright refusal to produce any documents.  Petitioners and Jefferies met and conferred on December 23, 2025, but Jefferies continued to refuse to produce even a single document.  After several additional conferrals, Jefferies served amended Responses and Objections on December 30, 2025,[2] in which it agreed—subject to extensive caveats—to produce certain unspecified categories of documents that it was already collecting and producing to the Debtors pursuant to the Debtors' Initial Set of Requests for Production of Documents from Jefferies Financial Group Inc. Pursuant to Bankruptcy Rule 2004 ("**Debtors' Rule 2004 Requests**").[3]  On December 31, 2025, Jefferies provided Petitioners with documents it had previously produced to the Debtors in response to the Debtors' Rule 2004 Requests.

The scope of Jefferies' purported agreement remains unclear.  Jefferies has stated that it will continue to "object[] to [the] production of particular documents or categories of documents produced [to the Debtors] in the future."[4]  This reservation of rights is particularly troubling given Jefferies' earlier position that it would produce only external correspondence to the Debtors and that, in the context of internal communications, it would screen documents for "relevance" before

---

[2]    Jefferies Financial Group Inc.'s Am. Objs. to Petitioners' Subpoena Dated December 30, 2025 ("**Jefferies' Amended Objections**") (attached to Tecce Decl. as **Exhibit 1**).

[3]    Debtors' Initial Set of Requests for Production of Documents from Jefferies Financial Group Inc. Pursuant to Bankruptcy Rule 2004, In re First Brands Group, et al., 25-90399 (CML) (Bankr. S.D. Tex.), Dkt. No. 488 ("**Debtors' Rule 2004 Requests**") (attached to Tecce Decl. as **Exhibit 2**).

[4]    **Ex. 1**, Jefferies' Am. Objs. at 1.

producing them to Petitioners. As a result, Jefferies' position threatens to substantially limit, or effectively nullify, its compliance with the Subpoena. Compounding the problem, Jefferies has not identified which categories of documents it intends to produce in the future pursuant to the Debtors' Rule 2004 Requests, or which categories it intends to withhold.

Jefferies has also refused to produce any documents beyond its repackaged Rule 2004 production to the Debtors, even though Petitioners' Subpoena seeks documents that extend beyond the scope of the Debtors' Rule 2004 Requests. In response to each such request, Jefferies has asserted a blanket objection to producing "any additional materials," claiming the requests are "apparently irrelevant."[5] Jefferies has further refused to engage on these issues unless Petitioners first post a bond to cover compliance costs. There is no basis for cost-shifting here, and certainly no basis for conditioning meaningful meet-and-confer discussions on the posting of a bond. In any event, Petitioners have advised Jefferies that they are willing to narrow the scope of their additional requests to mitigate any purported burden.

Mr. James founded First Brands over a decade ago and served as its CEO until October 13, 2025. In the Adversary Proceeding, the Debtors have brought various claims against Mr. James and the Related Entities concerning financing transactions involving First Brands, including supposed "factoring" arrangements between First Brands and Jefferies.

Jefferies is in possession, custody, or control of information relevant and critical to claims asserted by the Debtors and defenses to be asserted by Mr. James and the Related Entities in the Adversary Proceeding. Jefferies—through its asset management arm, Leucadia Asset Management, LLC, and its Point Bonita Capital Fund LLC and other related entities—was one of First Brands' largest financiers, holding approximately $715 million in accounts receivable and

---

[5]      See, e.g., id. at 8.

earning substantial fees through the arrangements.[6]  Jefferies was the underwriter of a $300 million

loan to First Brands.[7]  Jefferies also had a leading role in First Brands' attempted global refinancing

process in 2025.[8]  In addition, Jefferies, as the successor to Credit Suisse AG, Cayman Island

Branch, also served as administrative agent and collateral agent for First Brands' First Lien Term

Loan Agreement.[9]

In the Adversary Proceeding, the Debtors have brought eight counts alleging generally that

Mr. James and the Related Entities are responsible for a series of avoidable transfers that took

place before the Chapter 11 Cases,[10] including that "[o]n information and belief, Mr. James

secured funding from lenders for First Brands based on knowingly and intentionally false

representations about First Brands' financial position;" and that Mr. James "caused First Brands

to incur at least $2.3 billion in accounts receivable factoring liabilities based, at least in significant

---

[6]     See Alexander Gladstone & Lauren Thomas, How Jefferies Found Itself at the Center of First Brands'
        Collapse, Wall St. J. (Oct. 15, 2025), https://www.wsj.com/finance/how-jefferies-found-itself-at-the-center-
        of-first-brands-collapse-290f0a74 ("First Brands made near-daily payments to Point Bonita for years, as
        customers paid invoices on the roughly $715 million in accounts receivable that Point Bonita held. Jefferies
        had roughly $45 million of Point Bonita exposure while the fund's other investors including BlackRock and
        Morgan Stanley's asset-management arm held the rest. The group had been hoping to get back $900 million
        on the $715 million bet.") (attached to Tecce Decl. as **Exhibit 3**).

[7]     Letter from Rich Handler, CEO, and Brian Friedman, President, Jefferies Fin. Grp., Inc., Jefferies Provides
        Letter from Its CEO and President Regarding Point Bonita Capital and First Brands Group (Oct. 12, 2025),
        https://www.jefferies.com/about/leadership-letters/jefferies-provides-letter-from-its-ceo-and-president-
        regarding-point-bonita-capital-and-first-brands-group/ (attached to Tecce Decl. as **Exhibit 4**).

[8]     See Declaration Of Charles M. Moore In Support Of Debtors' Chapter 11 Petitions ¶¶ 13–15, 79, 81–82, 92,
        In re First Brands Group, et al., 25-90399 (CML) (Bankr. S.D. Tex.), Dkt. No. 22 (the "**Moore Decl.**")
        (attached to Tecce Decl. as **Exhibit 5**).

[9]     Id. ¶ 41.

[10]    The eight counts are Count 1: Turnover Of Estate Property Pursuant to 11 U.S.C. § 542); Count 2: Actual
        Fraudulent Transfer Pursuant To 11 U.S.C. §§ 548(a)(1)(A), 544(b), Ohio Rev. Code Ann. §§ 1336.04(A)(1),
        6 Del. Code § 1304(a)(1); Count 3: Constructive Fraudulent Transfer Pursuant to 11 U.S.C. §§ 548(a)(1)(B),
        544(b), Ohio Rev. Code Ann. §§ 1336.04(A)(2), 6 Del. Code § 1304(a)(2); Count 4: Money Had and
        Received; Count 5: Unjust Enrichment; Count 6:  Constructive Trust; Count 7: Accounting; Count 8: Illegal
        Dividend Pursuant to 8 Del. C. § 160 and 8 Del. C. § 174.  See Complaint, First Brands Group, LLC, et al.,
        v. Patrick James, et al., 25-03803 (CML) (Bankr. S.D. Tex.), Dkt. No. 17 ("**Complaint**") (attached to Tecce
        Decl. as **Exhibit 6**).

part, on non-existent or doctored invoices."[11]  The allegations in the Complaint are based heavily

"upon information and belief."[12]  And the Complaint suffers from various legal and factual

deficiencies.  Mr. James and the Related Entities have moved to dismiss it.[13]  Nonetheless, Jefferies

possesses documents that are directly relevant to those claims, and the Petitioners' defenses.

What is more, Jefferies' posture is particularly unjustified when it has falsely accused Mr.

James of pre-bankruptcy misconduct and misleadingly portrayed itself as a hapless First Brands

"victim."[14]  Now, it wants to avoid producing documents that would put the lie to Jefferies'

assertions.

Timing is important because the Adversary Proceeding is scheduled to move on a fast

track.[15]  As set forth in the Joint Statement Regarding Scheduling, fact discovery is supposed to

end on March 9, 2026.[16]  To that end, Petitioners quickly served the Subpoena on Jefferies on

---

[11]    **Ex. 6**, Compl. ¶¶ 5, 46, 100.

[12]    See Aff. of Charles Moore, Interim Chief Executive Officer In Supp. Of Debtors' Emergency Appl. For Prelim. Inj. Relief Including Emergency Mot. For TRO, First Brands Group, LLC, et al., v. Patrick James, et al., 25-03803 (CML) (Bankr. S.D. Tex.), Dkt. No. 19 (attached to Tecce Decl. as **Exhibit 7**); see also id. ¶¶ 27, 35 (allegations subject to "ongoing" investigation); id. ¶¶ 26, 28, 29, 30, 31, 34, 35, 37, 39, 40, 45, 46, 47, 51, 52, 53, 55, 56, 58 (allegations on "information and belief"); see also **Ex. 6**, Compl. ¶¶ 10, 11, 17, 26, 27, 34(b), 34(c)–(i), 55, 58, 59, 60, 64, 65, 68, 70, 71, 77, 78, 79, 82, 83, 84, 86, 87, 89, 100, 101, 114 (allegations on "information and belief"); id. ¶ 15 ("currently believe").

[13]    See Defendants' Motion To Dismiss Pursuant To Fed. R. Civ. P. 12(b)(6) The Debtors' Complaint For Failure To State A Claim, Or, Alternatively, Pursuant To Fed. R. Civ. P. 12(e) For A More Definite Statement, First Brands Group, LLC, et al., v. Patrick James, et al., 25-03803 (CML) (Bankr. S.D. Tex.), Dkt. No. 108 (attached to Tecce Decl. as **Exhibit 8**).

[14]    See **Ex. 4**, Handler & Friedman Letter, supra note 7; **Ex. 3**, Gladstone & Thomas, supra note 6; Alexander Gladstone & Margot Patrick, First Brands Boss Resigns and Jefferies Seeks to Calm Its Investors, Wall St. J. (Oct. 13, 2025), https://www.wsj.com/finance/first-brands-ceo-patrick-james-resigns-cc41acab (attached to Tecce Decl. as **Exhibit 9**); see also Leucadia's Objection to Debtors' Factoring Procedures Motion, at ¶ 1, In re First Brands Group, et al., 25-90399 (CML) (Bankr. S.D. Tex.), Dkt. No. 1049 ("**Leucadia Objection**") (attached to Tecce Decl. as **Exhibit 10**) ("The Debtors have admitted that they committed a massive fraud on the LAM Parties and other Third-Party Factors. They acknowledge that many of the receivables they sold were fake or inflated, meaning that they stole hundreds of millions from LAM alone and billions in total from the Third-Party Factors.").

[15]    Joint Statement Regarding Scheduling Proposals and Discovery, First Brands Group, LLC, et al., v. Patrick James, et al., 25-03803 (CML) (Bankr. S.D. Tex.), Dkt. No. 97 (attached to Tecce Decl. as **Exhibit 11**).

[16]    Id. ¶ 5.

December 2, 2025.  After Jefferies responded on December 16, 2025 with a blanket "no,"[17] Petitioners made several follow-up inquiries on December 17, December 23, December 24, and December 29.[18]  On December 30, 2025, Jefferies and the Jefferies' Affiliated Entities served amended Responses and Objections where it finally agreed to produce certain unspecified categories of documents it has already reviewed and produced or will produce to the Debtors pursuant to the Debtors' Rule 2004 Requests—although Jefferies insists it will continue to "object[] to [the] production of particular documents or categories of documents produced [to the Debtors] in the future."[19]  Accordingly, it remains unclear what categories of documents Jefferies intends to produce and withhold.

And beyond an abbreviated version of what Jefferies provides to the Debtors as part of their Rule 2004 discovery, Jefferies will not commit to providing the Petitioners with any additional documentation, noting in response to each request that it "objects to the production of any additional materials" due to the "apparent irrelevance of the Request."[20]  This is particularly problematic because the Subpoena requests documents on several critical topics that are outside the scope of the Rule 2004 discovery previously served on Jefferies.  Despite their good-faith efforts to resolve this dispute, Petitioners have been forced to file this Motion.  In light of the timing set in the Adversary Proceeding, Petitioners respectfully request an order (i) compelling Jefferies to comply with the Subpoena duces tecum by no later than January 22, 2026.

---

[17]    Jefferies' Responses and Objections to Petitioners' Subpoena Dated December 16, 2025 ("**Jefferies' Original Responses and Objections**") (attached to Tecce Decl. as **Exhibit 12**).

[18]    See Correspondence between counsel for Petitioners and counsel for Jefferies, dated December 16, 2025 to December 30, 2025 (attached to Tecce Decl. as **Exhibit 13**).

[19]    **Ex. 1**, Jefferies' Am. Objs.

[20]    See Correspondence between counsel for Petitioners and counsel for Jefferies, dated December 31, 2025 (attached to Tecce Decl. as **Exhibit 14**).

## BACKGROUND

### A.    First Brands and the Chapter 11 Cases

Mr. James built First Brands over the last two decades.  It is a vertically-integrated global manufacturer and supplier of automotive parts that spans five continents and employs 26,000 people.[21]  It has twenty-five well-known brands and exclusively supplies the auto industry's largest after-market customers, including well-known automotive retailers (Napa Auto Parts, AutoZone, O'Reilly, and Advanced Auto Parts), national retailers (Walmart and Costco), and original equipment manufacturers (OEMs).  Even though the Company faced a combination of the COVID-19 global pandemic, supply-chain disruptions, and increasing interest rates, its sales still grew from $500 million in 2018 to $5 billion in 2024.

Between September 24, 2025 and September 28, 2025, the Debtors commenced the Chapter 11 Cases before the Bankruptcy Court.  The Company's challenges forcing it to seek bankruptcy protection do not stem from its product offerings or changes in consumer demand. Instead, external forces—tariffs in particular—constrained liquidity.[22]  Certain products were tariffed at rates as high as 73%, and tariffs led to landed inventory cost increases of approximately $99 million between April and August 2025.[23]

---

[21]    See, e.g., **Ex. 5**, Moore Decl. ¶¶ 8–10.

[22]    See Moore Decl. ¶ 12 ("[I]n recent months geopolitical uncertainty and headwinds from newly imposed tariffs have pressurized global supply chains and layered additional complications to the Company's Operations …. At the same time, the Company faced mounting funded debt and lease obligations between May and August 2025, particularly with respect to its equipment and inventory lessor, Onset.  These factors snowballed into a liquidity crisis . . . ."); See also Transcript of First Day Hearing, at 21:11–19, In re First Brands Group, et al., 25-90399 (CML) (Bankr. S.D. Tex.), Dkt. No. 307-2 (attached to Tecce Decl. at **Exhibit 15**) ("[DEBTORS' COUNSEL:]  [H]ow did we get here? . . . The tariffs have caused additional landing costs for good for the company, but also provided the company with an opportunity, given where some of its facilities were, to try to minimize the future exposure to tariffs, especially between the United States and Mexico, but that required capital and reinvestments.").

[23]    **Ex. 5**, Moore Decl. ¶¶ 74–75.

## B.    The So-Called "Third-Party Factoring" Arrangements

Jefferies has a multi-prong relationship with First Brands.  Its most significant involves so-called third-party "factoring" arrangements.[24]  It is becoming clearer from the filings in the bankruptcy cases that substantively these financings were something different than standard third-party factoring.  Typically, a factor purchases the company's account receivable owing from a customer at a discount to face value and then removes the company from the relationship.[25]  Something different happened here.  Instead, First Brands kept servicing the receivable; and the factors essentially became lenders to First Brands, extending an unsecured loan at high interest rates, *e.g.*, in the mid-teens.[26]  What is more, certain factors' conduct may have invited the review

---

[24]  Id. ¶¶ 32, 72.

[25]  See Black's Law Dictionary (12th ed. 2024) (defining "factoring" as "the buying of accounts receivable at a discount.  The price is discounted because the factor (who buys them) assumes the risk of delay in collection and loss on the accounts receivable."); id. (defining "factor's lien" as "[a] lien, usu. statutory, on property held on consignment by a factor.  It allows the factor to keep possession of the property until the account has been settled.").

[26]  See, e.g., Transcript of Hearing on Preliminary Injunction, at 147:5–21, First Brands Group, LLC, et al., v. Patrick James, et al., 25-03803 (CML) (Bankr. S.D. Tex.) ("**PI Hearing Transcript**") (attached to Tecce Decl. as **Exhibit 16**) ("[DEFENDANTS' COUNSEL:] [T]hese are payments that were made to . . . Katsumi, . . . UBS . . . Jefferies -- These are lenders to First Brands and/or its affiliates[?] … [MR. MOORE:] These are not lenders.  These are third-party factors . . . [DEFENDANTS' COUNSEL:] But they're creditors of the company.  Correct?  [MR. MOORE:]  They shouldn't be.  In a normal factoring arrangement, they would have purchased the invoices from the company.  [DEFENDANTS' COUNSEL:]  But they're receiving funds from the company, according to this schedule.  Correct?  [MR. MOORE:]  They're supposed to be, yes . . . . But that's one of the red flags . . . ."); Motion Of Debtors For Order (I) Establishing Third-Party Factoring Procedures For (A) The Review And Reconciliation Of The Debtors' Receipts, And (B) The Release Of Funds To The Debtors' Estates And Third-Party Factors; (II) Authorizing Customers To Remit Receivables Without Liability; And (III) Granted Related Relief ¶ 1, In re First Brands Group, et al., 25-90399 (CML) (Bankr. S.D. Tex.), Dkt. No. 807 ("Under the structure of the Factoring Facilities, even though the Company had technically sold the receivable to a Third-Party Factor, the Company continued to service the Factored Receivable (i.e., the Customer would remit the payment to the Company once the receivable became due and the Company would then transfer the amount owed to the Third-Party Factor related to that particular receivable.) (the "**Factoring Procedures Motion**") (attached to Tecce Decl. as **Exhibit 17**); Eric Platt et al., First Brands Financier Says 'A Lot of People Made a Lot of Money' From Bankrupt Group, Financial Times (Dec. 3, 2025), https://www.ft.com/content/40e93423-b551-478c-ab0d-447a62dcfda5 ("First Brands often paid interest in the mid-teens percentage range, compared with the typical 5-8 per cent that might be charged on similar loans.") (attached to Tecce Decl. as **Exhibit 18**); **Ex. 3**, Gladstone & Thomas, supra note 6 ("Jefferies' asset management arm, Leucadia, had become one of First Brands' biggest financiers by purchasing First Brands' accounts receivables, an arrangement known as factoring.  Beginning in 2019, it had been buying the company's expected payments from retailers . . . .  First Brands made near-daily

of regulatory authorities.[27]  Jefferies' other relationships with the Debtors before the Chapter 11

Cases included:

- Jefferies' asset management arm, Leucadia, had become one of First Brands' biggest financiers by purchasing First Brands' accounts receivable through its Point Bonita fund, holding approximately $715 million in receivables.[28]  First Brands made near-daily payments to Point Bonita for years.

- Jefferies, through Point Bonita, was aware that First Brands was servicing the relevant receivables, thereby turning the factoring arrangements into unsecured loans with high interest rates.[29]

- In 2023, Jefferies underwrote one $300 million loan to First Brands.[30]

- In 2025, Jefferies had a leading role in First Brands' global refinancing process, including advising on restructuring, capital market, and liability management issues.[31]

---

payments to Point Bonita [a Leucadia entity] for years, as customers paid invoices on the roughly $715 million in accounts receivable that Point Bonita held.").

[27]  See, e.g., Kaye Wiggins & Ortenca Aliaj, SEC probes Jefferies over First Brands, Financial Times (Nov. 27, 2025), https://www.ft.com/content/86d90ce5-5800-4514-f46a38aa521d (attached to Tecce Decl. as **Exhibit 19**) ("The US Securities and Exchange Commission is investigating investment bank Jefferies over its relationship with collapsed car parts company First Brands Group.  The regulator is seeking information about whether Jefferies gave investors in its Point Bonita fund enough information about their exposure to the auto business . . . .  It is also looking into internal controls and potential conflicts within and between different parts of the bank. . . . [A] specialist invoice-finance fund [Jefferies] manages, Point Bonita Capital, had about $715 mm invested in 'receivables' — money owed under customer invoices — from retailers that bought First Brands products such as windscreen wipers to sell to consumers.  Jefferies has said the receivables were due from blue-chip companies including Walmart. Point Bonita documents did not list any exposure to First Brands as of June, but showed that the fund's second and third largest exposures were to its customers, Walmart and auto parts retailer O'Reilly . . . .  Bankruptcy filings have confirmed that invoice lenders that provided $2.3bn of financing linked to receivables were all paid by First Brands rather than its customers . . . .  The Financial Times also reported in October that Jefferies earned extra fees on financing it provided to First Brands through a 'side letter' with the company, which some lenders said was not disclosed to them and may have violated the terms of their loan.  Jefferies has since confirmed the existence of the arrangement.  It stated that First Brands received a legal opinion confirming the fees did not breach its loan terms and that a document listing the letter was disclosed to all of the group's lenders.").

[28]  See **Ex. 3**, Gladstone & Thomas, supra note 6.

[29]  See **Ex. 16**, PI Hearing Transcript at 147:5–21, supra note 26.

[30]  See **Ex. 4**, Handler & Friedman Letter, supra note 7.

[31]  See **Ex. 5**, Moore Decl. ¶¶ 13–15, 79, 81–82, 92.

- Jefferies earned extra fees on financing it provided to First Brands through a "side letter" with the Company, which is under investigation by the Securities and Exchange Commission.[32]

It also bears emphasizing what is now being said out loud in the market: these financiers earned significant amounts of money from their relationships with First Brands. Raistone, who was supposedly so disgruntled with First Brands that it was the first party to seek the appointment of an examiner,[33] openly admitted during a conference in New York earlier this month that "*a lot of people made a lot of money over many, many, years on First Brands . . . . So they're not all sad. They're not all kicking themselves*."[34]

### C. The Adversary Proceeding

On November 3, 2025, the Debtors in the bankruptcy cases initiated the Adversary Proceeding by filing the Complaint. They claim the Petitioners committed fraud that impacted many non-parties involved in certain third-party factoring arrangements. In addition to filing the Complaint, the Debtors submitted an ex parte application seeking, among other things, a temporary restraining order and preliminary injunction "freezing the assets of Patrick James and any and all

---

[32]   **Ex. 19**, Wiggins & Aliaj, supra note 27.

[33]   See Emergency Mot. of Raistone Parties For Appointment of Examiner Pursuant To Section 1104(c) Of Bankruptcy Code, filed by Raistone Capital LLC and Raistone Purchasing LLC—Series XXXII (collectively, "**Raistone**"), In re First Brands Group, et al., 25-90399 (CML) (Bankr. S.D. Tex.), Dkt. No. 307 (attached to Tecce Decl. as **Exhibit 20**).

[34]   See **Ex. 18**, Platt et al., supra note 26 ("One of the largest middle men in the First Brands' financings has said that 'a lot of people made a lot of money' lending to the bankrupt car parts maker, as they chased the high yields that it paid on its debt. The comments came from Raistone chief executive David Skirzenski on Wednesday at a conference for investors in trade and supply chain finance . . . . 'Frankly a lot of people made a lot of money over many, many, years on First Brands,' Skirzenski said at the Global Trade Review annual conference in New York. 'So they're not all sad. They're not all kicking themselves.'").

companies he owns and controls in connection with the misappropriation and potential dissipation of funds belonging to the Debtors' estates."[35]  The Court issued a TRO the same day.[36]

On November 10, 2025, the Court held a hearing on the Debtors' request for a preliminary injunction,[37] allegedly supported by their review of millions of pages of documents.[38]  On November 12, 2025, the Court denied the preliminary injunction,[39] finding, among other things, that there was no evidence of likelihood of success on the merits as to Albion Realty LLC; Alester Technologies LLC; Bond Street Asset Management LLC; Ignite Acquisition Holdings LLC; Larchmont LLC; or Pegasus Aviation, LLC for any claim.[40]  The Court also held that there was no substantial threat of irreparable injury,[41] and that the balance of harms and public policy weighed in the Petitioners' favor.[42]

Other than alleging in conclusory fashion that Mr. James' "and his co-conspirators' activities included" issuing "erroneous or fabricated invoices in connection with accounts receivable factoring activities" or that "upon information and belief" this happened at Mr. James' direction, the Complaint does not connect Mr. James to the factoring.[43]  Nor did evidence at the

---

[35]    See Debtors' Emergency Ex Parte Appl. for Prelim. Inj. Relief, Including an Emergency Mot. for a Temporary Restraining Order ("**TRO**"), Prelim. Inj., and Request for Hearing ¶ 5, First Brands Group, LLC, et al., v. Patrick James, et al., 25-03803 (CML) (Bankr. S.D. Tex.), Dkt. No. 18 (attached to Tecce Decl. as **Exhibit 21**).

[36]    See Order Granting TRO, First Brands Group, LLC, et al., v. Patrick James, et al., 25-03803 (CML) (Bankr. S.D. Tex.), Dkt. No. 14 (attached to Tecce Decl. as **Exhibit 22**).

[37]    See **Ex. 16**, PI Hearing Transcript at 147:5–21.

[38]    See id. at 32:18–20 ("[DEBTORS' COUNSEL:] And was the scope of the documents collected and under review millions of documents?  [CRO] Yes.").

[39]    See Transcript of Hearing Denying Preliminary Injunction, at 24:3–5, 27:14–24, 29:15, 30:3–7, 31:1–3, First Brands Group, LLC, et al., v. Patrick James, et al., 25-03803 (CML) (Bankr. S.D. Tex.) ("**PI Decision Transcript**") (attached to Tecce Decl. as **Exhibit 23**).

[40]    Id. at 24:3–5.

[41]    Id. at 27:14–24.

[42]    Id. at 29:1–5, 30:3–7.

[43]    **Ex. 6**, Compl. ¶¶ 45, 55; see, e.g., id. ¶¶ 37, 47–55.

preliminary-injunction hearing connect Mr. James to supposedly manipulating invoices.[44]  The evidence did show that in some instances the invoices were not altered or were actually lower.  The evidence also showed that the factors themselves made changes to the schedules containing the allegedly changed invoices.[45]

Jefferies, acting through the Jefferies Financial Group and the various Jefferies Affiliated Entities, such as Leucadia Asset Management LLC, has parroted the allegations in the Debtors' Complaint in various filings in the Chapter 11 Cases.  Specifically, Jefferies has alleged that First Brands has "committed a massive fraud on [the Jefferies' Affiliated Entities] and other Third-Party Factors[,]" and that "many of the receivables . . . sold were fake or inflated, meaning that [First Brands] stole hundreds of millions from [the Jefferies' Affiliated Entities] alone and billions in total from the Third-Party Factors."[46]  Like the Debtors, Jefferies and the Jefferies' Affiliated Entities have failed to provide—and, in connection with this Subpoena, are refusing to provide—any evidence to substantiate these significant allegations.

### D.    The Subpoena

Given Jefferies' central role in the Company's pre-petition financing arrangements under scrutiny, the Subpoena seeks documents that go to the heart of this case.  The requests target

---

[44]    See **Ex. 23**, PI Decision Transcript at 23:8–15 ("In James' defense, there's nothing I saw where he's personally directing anyone to do anything.  There are messages from parties indicating he is aware and messages between parties saying James wants funds transferred.  I'm not sure what all that means yet.  There's nothing showing that James, himself, was manipulating invoices, but it is clear First Brands was moving tens of millions of dollars through unaffiliated accounts.").

[45]    See **Ex. 16**, PI Hearing Transcript at 61:14–20 ("[DEBTORS' COUNSEL:]  And so that's an instance where the invoice number was not inflated . . . .  Were there also some instances in the nomination packet sent to … third-party factors where there was no change reflected in the invoice value?  [CRO:]  Yes."); id. at 62:7–12 ("[DEBTORS' COUNSEL:]  So we've now seen examples of invoices that were increased at significant proportions, and we've seen examples of invoices that were decreased, and we've seen at least one example where the invoice stayed the same"); id. at 129:19–22 ("[DEBTORS' COUNSEL:]  And so the schedule that you testified about today was the schedule that [factor representative] attached to her email.  Correct?  [CRO:]  Yes…..  She updated the file that he had sent for the specific areas that she mentioned.").

[46]    See **Ex. 10**, Leucadia Objection ¶ 1.

Jefferies' pre-petition factoring agreements and arrangements with First Brands—including but not limited to the side letters, ancillary agreements, and communications with investors and limited partners, internal communications within Jefferies and between or among Jefferies and each of Jefferies' Affiliated Entities, as well as the due diligence that Jefferies conducted before purchasing hundreds of millions of dollars in receivables before the Chapter 11 Cases.

The Subpoena further seeks documents Jefferies has produced to the Debtors or their advisors concerning the factoring arrangements, alleged accounting irregularities, or purported misconduct now being attributed to Mr. James. Jefferies cannot simultaneously profit from these financing arrangements and then refuse to produce documents to Petitioners, the defendants in the Adversary Proceeding, that could potentially exonerate Mr. James—the very individual the Debtors have targeted.

### E.    **<u>Jefferies' Refusal to Produce Any Document Beyond What It Produces Pursuant to the Debtors' Rule 2004 Requests to It</u>**

Fact discovery has started in the Adversary Proceeding, including third-party discovery of more than twenty (20) entities, such as First Brands' factors, off-balance-sheet lenders, and outside auditors. Jefferies is the only party who has been served with a subpoena who has outright refused to produce all documents it has already agreed to produce to Debtors, and to collect and produce additional documents without the posting of a bond.

Specifically, Patrick James and the Related Entities effectuated service of the Subpoena on Jefferies in New York City on December 2, 2025. On December 16, 2025, Jefferies responded with an outright refusal to produce any discovery, stating in response to each of the 31 requests

that "Jefferies objects to production of any materials given the apparent irrelevance of the Request to the Adversary Proceeding . . . ."[47]

Despite Patrick James and the Related Entities' repeated requests for an immediate conferral, Jefferies waited days and did not make itself available for a conferral until December 23, 2025.  At that meet and confer, counsel for Patrick James and the Related Entities emphasized again the relevance of the information sought by the Subpoena and expressed that the objections were insufficient, and the refusal to produce any document was unreasonable and not supported by the law.  In response at the conferral and in emails afterwards, counsel for Jefferies again objected to produce even one document, including a refusal to commit to produce documents that it has already produced to the Debtors in the Chapter 11 Cases in response to the Debtors' Rule 2004 Requests—the re-production of which would carry minimal, if any burden at all on Jefferies.

On December 30, 2025, after extensive additional correspondence between counsel, Jefferies and the Jefferies Affiliated Entities served amended Responses and Objections stating that they would produce, on a professionals' eyes only basis pursuant to the protective order entered at Dkt. No. 408 in Case No. 25-90399 (Bankr. S.D. Tex.), only: (1) all documents that Jefferies has produced to date in response to the Debtors' Rule 2004 Requests, and "(2) all documents it will produce to the Debtors in response to the Debtors' Rule 2004 Requests in the future, unless Jefferies objects to production of particular documents or categories of documents produced in the future and explains the basis for such objection."[48]  Jefferies provided no further information identifying which categories of documents it intends to produce or which it intends to withhold from its Rule 2004 productions.

---

[47]    **Ex. 12**, Jefferies' Original Responses and Objs., at 8–25.

[48]    **Ex. 1**, Jefferies' Am. Objs., at 3.

In addition, in a statement repeated at the end of each response, Jefferies asserted that it "objects to the production of any additional materials" due to the "apparent irrelevance of the Request" and Petitioners' refusal to provide "security . . . to ensure that Jefferies' expenses in responding to the Subpoena will be borne" by the Petitioners.[49]

On December 31, 2025, Jefferies produced to Petitioners the documents it had produced to the Debtors to date pursuant to the Debtors' Rule 2004 Requests, on a professionals' eyes only basis.

However, in addition to refusing to produce their entire Rule 2004 discovery, Jefferies has refused to discuss a subsequent production beyond the Debtors' Rule 2004 Requests—even though Petitioners have said they would limit the scope of any subsequent production to reduce any purported burden on Jefferies—until Petitioners post a bond to cover costs to comply with the subpoena. Jefferies has taken this position even though the Subpoena requests documents that are broader than the Debtors' Rule 2004 Requests and seeks categories of information that was not sought by the Debtors in Rule 2004 discovery.

## LEGAL STANDARD

"Parties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case, considering the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit. Information within this scope of discovery need not be admissible in evidence to be discoverable." Fed. R. Civ. P. 26(b)(1). The "discovery parameters set forth in Rule 26," including its relevance standard,

---

[49]    See, e.g., id. at 8–26.

"also apply to subpoenas served upon non-parties." Citizens Union of City of N.Y. v. Att'y Gen. of N.Y., 269 F. Supp. 3d 124, 139 (S.D.N.Y. 2017). "The burden of demonstrating relevance is on the party seeking discovery," but "[o]nce relevance has been shown, it is up to the responding party to justify curtailing discovery." Fireman's Fund Ins. Co. v. Great Am. Ins. Co. of N.Y., 284 F.R.D. 132, 135 (S.D.N.Y. 2012) (citation omitted).

"Motions seeking to enforce or quash subpoenas are properly made in the court within the district that compliance is sought, and not the issuing court." Avila v. Target Corp., 2022 WL 17540322, at *2 (E.D.N.Y. Nov. 18, 2022).

## ARGUMENT

The Court should compel Jefferies to comply with the Subpoena. Relevance is not in dispute, and Jefferies' outright and boilerplate refusals are meritless and unsupported by the law.

### A.    Jefferies Undeniably Possesses Relevant Information

"A subpoena issued to a non-party pursuant to Rule 45 is subject to Rule 26(b)(1)'s overriding relevance requirement." Warnke v. CVS Corp., 265 F.R.D. 64, 66 (E.D.N.Y. 2010) (internal quotation marks omitted). Pursuant to Rule 26(b)(1), parties may obtain discovery regarding any non-privileged matter that is relevant to the subject matter involved in the pending litigation. Fed. R. Civ. P. 26(b)(1). Relevance in this context "'has been construed broadly to encompass any matter that bears on, or that reasonably could lead to other matter that could bear on any issue that is or may be in the case.'" AP Links, LLC v. Russ, 299 F.R.D. 7, 11 (E.D.N.Y. 2014) (quoting Oppenheimer Fund, Inc. v. Sanders, 437 U.S. 340, 351 (1978)).

There is no dispute that Jefferies possesses information relevant to the conduct at issue in the Adversary Proceeding based on its extensive involvement with First Brands, in various lending capacities, prior to the Bankruptcy Case. That involvement includes not only its factoring arrangements with First Brands, but also related side letters and ancillary agreements; the due

16

diligence it conducted before the Chapter 11 Cases in connection with its purchase of hundreds of millions of dollars in receivables; and its communications with investors regarding its exposure to First Brands.

Moreover, the Subpoena's requests are narrowly tailored to the allegations in the Complaint. The Complaint alleges that Mr. James "induced third-party lenders to lend to First Brands irrespective of its true financial condition to bring more money into First Brands only so that portions of it could be siphoned away into Defendants' accounts for the personal use of Mr. James and his family, including on terms First Brands would never be able to repay." Compl. ¶ 46. Several of Petitioners' document requests in the Subpoena (each, an "**RFP**") are directly relevant to that allegation, including requests seeking (a)"[a]ll lending or credit agreements" that Jefferies "entered into with First Brands" (RFP 1); (b) documents and communications "regarding the financial condition or solvency of First Brands Group," (RFP 3); (c) documents and communications "regarding any assets, inventory, receivables, or other property of First Brands Group" that Jefferies claims to be its collateral or that it claims to have any interest in (RFP 4); (d) documents and communications that involve Jefferies and "any of the [Petitioners]" (RFP 17); (e) documents and communications "concerning Jefferies' implementation and maintenance of the DQ List for First Brands Group's or the Company's Funded Debt Facilities" (RFP 26); (f) documents and communications "concerning First Brands Group's or the Company's periodic lender calls" (RFP 27); and (g) documents and communications "concerning First Brands Group's or the Company's disclosures to lenders in connection with its Funded Debt Facilities" (RFP 28).[50]

The Complaint further alleges that "[o]n information and belief, [that] Mr. James secured funding from lenders for First Brands based on knowingly and intentionally false representations

---

[50]     Petitioners' Subpoena to Jefferies (attached to Tecce Decl. as **Exhibit 24**).

about First Brands' financial position."  Compl. ¶¶ 99–111.  As noted previously, Jefferies served as administrative agent and collateral agent for *both* First Brands' First and Second Lien Term Loans.  Accordingly, the Subpoena seeks (a) "[a]ll lending or credit agreements" between Jefferies and First Brands Group (RFP 1); (b) documents and communications received by Jefferies concerning "the financial condition or solvency of First Brands Group" (RFP 3); (c) documents and communications "regarding any assets . . . of First Brands Group" that Jefferies "claim[s] to have an[] interest in[]" (RFP 4); (d) documents and communications "between employees or representatives affiliated with Jefferies and employees or representatives of Apollo concerning First Brands Group or the Company" or "with Apollo concerning First Brands Group or the Company" (RFPs 18, 30); (e) documents and communications provided to lenders in connection with the First and Second Lien Term Loans (RFPs 25, 28); (f) documents related to periodic lender calls (RFPs 27); (g) documents and communications "concerning any nondisclosure agreement entered into between Jefferies and any other party, . . . relating to First Brands Group or the Company in any manner whatsoever." (RFP 29); and (h) documents and communications "with any other lender or off-balance sheet financing provider to First Brands Group or the Company concerning First Brands Group or the Company" (RFP 31).[51]

The Complaint further alleges that "under Mr. James' leadership and direction[,] . . . . the same invoice was factored more than once to different third-party factors."  Compl. ¶ 52.  As noted previously, Jefferies—through Leucadia Asset Management, LLC and Point Bonita Capital Fund LLC—holds approximately $715 million in factored First Brands Group receivables.[52] Accordingly, Mr. James seeks, among other things, (a) documents and communications

---

[51]      Id.

[52]      **Ex. 3**, Gladstone & Thomas, supra note 6.

concerning any factoring agreements between Jefferies and First Brands Group; (b) documents and communications concerning any due diligence performed by Jefferies in connection with those factoring agreements (RFPs 8, 9, 10); and (c) "[d]ocuments sufficient to show each of the third parties" that Jefferies has a factoring relationship with (RFP 11); and (d) documents and communications provided by Jefferies to third-parties, including the Debtors, concerning Jefferies's factoring transactions with First Brands (RFPs 19–21).[53]

The Complaint also alleges that "Mr. James would have continued unabated if certain lenders had not, in July 2025, started asking questions and demanding a quality of earnings report before they would consider issuing any additional debt financing to First Brands" in connection with the global refinancing process run by Jefferies. Compl. ¶ 13. In light of Jefferies involvement, the Subpoena seeks all documents and communications concerning "the Global Refinance Process, including all communications between" Jefferies and "potential or existing lenders, buyers, or other investors" and "concerning the QofE" (RFPs 15–16).[54]

Finally, it has been publicly reported "that Jefferies earned extra fees on financing it provided to First Brands through a 'side letter' with the company, which some lenders said was not disclosed to them and may have violated the terms of their loan."[55] In light of the Complaint's allegations concerning fraudulent representations to First Brands Group lenders,[56] the Subpoena seeks "[a]ll documents and communications concerning any side letter agreements" between Jefferies, its affiliates, and First Brands Group (RFPs 6, 7).[57]

---

[53]    **Ex. 24**, Petitioners' Subpoena to Jefferies.

[54]    Id.

[55]    See, e.g., **Ex. 19**, Wiggins & Aliaj, supra note 27.

[56]    See **Ex. 6**, Compl. ¶ 46.

[57]    **Ex. 24**, Petitioners' Subpoena to Jefferies.

While Jefferies has agreed to produce unspecified categories of documents it has produced, or will produce, in response to the Debtors' Rule 2004 discovery requests, Jefferies has refused to provide any further documents or communications in response to Petitioners' subpoena. Jefferies' refusal to consider further productions is problematic because there are numerous RFPs in the Subpoena that were not squarely requested by the Debtors in Rule 2004 discovery. For example, the Subpoena seeks, *inter alia,* communications regarding the financial condition or solvency of First Brands (RFP 3); documents and communications regarding any assets that Jefferies claims as collateral or claims to have an interest in (RFPs 4, 13); documents and communications concerning side letter agreements or other ancillary agreements (RFP 6); documents and communications with Jefferies' (and Leucadia Asset Management's and Point Bonita's) investors and limited partners concerning First Brands (RFP 7); documents regarding systems and processes Jefferies employs for due diligence and implementation of factoring arrangements (RFPs 9, 10); documents identifying third parties with whom Jefferies has factoring relationships (RFP 11); documents and communications concerning the "true sales" status of factoring agreements (RFP 14); documents and communications concerning the global refinancing process (RFP 15); documents and communications concerning the quality of earnings reports (RFP 16); documents concerning any of the defendants in the Adversary Proceeding (RFP 17); documents and communications with Apollo, including concerning Apollo's short position with respect to First Brands' syndicated debt (RFPs 18, 30); documents and communications concerning Jefferies' service as administrative agent or collateral agent for First Brands' Funded Debt Facilities (RFP 25); documents and communications concerning the disqualified lender list (RFP 26); documents and communications concerning periodic lender calls and disclosures to lenders (RFPs 27, 28); documents and communications concerning nondisclosure agreements entered into between

Jefferies and any other party (RFP 29); and documents and communications with other lenders or off-balance sheet financing providers (RFP 31). Because the Subpoena is broader than the Debtors' Rule 2004 Discovery in these (and other) ways, Jefferies' refusal to even discuss these categories of documents is problematic. Jefferies must produce documents from these categories to comply with the subpoena.

There are additional issues with documents produced by Jefferies in response to Debtors' Rule 2004 Discovery. As noted above, on December 31 Jefferies produced to Petitioners documents it had previously produced to the Debtors. An initial review of that production demonstrates why Jefferies' reliance on that production is problematic: Jefferies production to the Debtors did not include, among others, Jefferies' internal documents and communications, communications between and among Jefferies and each of Jefferies' Affiliated Entities, documents from custodians at each of Jefferies' Affiliated Entities, and communications beyond emails and Bloomberg Chat messages, such as text messages, Slack, Microsoft Teams messages, or other instant messages. The failure to include any document custodian from the Jefferies' Affiliated Entities is particularly problematic because Jefferies used entities such as Leucadia Asset Management and Point Bonita Capital to purchase approximately $715 million in accounts receivable from First Brands.[58]

Finally, and as described in further detail below, Petitioners have repeatedly assured Jefferies that they are willing to engage in a good faith conversation to negotiate a search protocol to ensure the burden on Jefferies is limited, including to narrow date ranges, custodians, and search terms. Jefferies has refused to even have such a conversation.

---

[58]    See **Ex. 3**, Gladstone & Thomas, supra note 6.

### B.    The Court Has Personal Jurisdiction Over Jefferies

A court may exercise personal jurisdiction over a third party under Rule 45 if (1) service was proper, (2) there is a statutory basis for personal jurisdiction, and (3) exercising jurisdiction is consistent with constitutional due process.  <u>Licci ex rel. Licci v. Lebanese Canadian Bank, SAL</u>, 673 F.3d 50, 59–60 (2d Cir. 2012).  Federal Rule 45(d)(2)(B)(i) states, "At any time, on notice to the commanded person, the serving party may move the ***court for the district where compliance is required*** for an order compelling production or inspection" (emphases added).

Here, the service on Jefferies was properly made on its registered agent at Jefferies Financial Group Inc., c/o C T Corporation System, 28 Liberty Street, New York, New York 10005. Because Jefferies designated a registered agent in New York to accept service of process, this Court has jurisdiction to compel compliance with the Subpoena served on Jefferies.  <u>The Rockefeller Univ. v. Ligand Pharms.</u>, 581 F. Supp. 2d 461 (S.D.N.Y. 2008) (unrevoked authorization to do business and designation of registered agent amounted to consent to personal jurisdiction).

### C.    The Subpoena Presents No Undue Burden on Jefferies

Jefferies asserted blanket objections to the Subpoena, claiming—without elaboration—that the requests are "overly broad, unduly burdensome, irrelevant, and disproportionate to the needs of the Adversary Proceeding."[59]  This is insufficient.  "Because the burden is on the party seeking to quash a subpoena, that party cannot merely assert that compliance with the subpoena would be burdensome without setting forth the manner and extent of the burden and the probable negative consequences of insisting on compliance."  <u>Kirschner v. Klemons</u>, 99-CV-4828 (RCC), 2005 WL 1214330, at *2 (S.D.N.Y. May 19, 2005).  Likewise, "[t]he mere assertion that a subpoena is

---

[59]    **Ex. 1**, Jefferies' Am. Objs.

burdensome, without evidence to prove the claim, cannot form the basis for an 'undue burden' finding." In re Cty. of Orange, 208 B.R. 117, 121 (Bankr. S.D.N.Y. 1997).

Here, Jefferies asserts, without evidence, that "the Subpoena is unduly burdensome" because "the cost of responding" will "vastly" exceed $20,000, and it "has well-founded concerns about Patrick James' and his Affiliated Entities' ability to bear the necessary costs of Jefferies' compliance with the Subpoena[.]"[60] But Jefferies offers no declaration, cost estimate, hit count, or other factual support to substantiate those assertions. Courts routinely reject such conclusory claims. See Samsung Elecs. Co. v. Microchip Tech. Inc., 347 F.R.D. 252, 261 (S.D.N.Y. 2024) (no undue burden where the party "mere[ly] assert[ed] that tracking down information and documents will be . . . difficult" and did "not contend that the requested production [was] likely to be voluminous"); see also In re Outpatient Med. Ctr. Emp. Antitrust Litig., No. 21-CV-305, 2023 WL 4181198, at *12 (N.D. Ill. June 26, 2023) ("This conclusory statement [that a discovery request posed undue burden], without a supported hit count and detailed burden estimate, does not adequately address the final proportionality factor.").  Moreover, Petitioners' counsel repeatedly advised Jefferies that they were willing to work cooperatively to reduce any purported burden, including by negotiating reasonable limitations on custodians, date ranges, and search terms. Jefferies nonetheless refused to engage.

Jefferies' demand that Petitioners post a bond to cover its compliance costs is equally unsupported and should be rejected outright. In evaluating cost-shifting under Rule 45, courts in this District consider: "(1) whether the nonparty has an interest in the outcome of the case; (2) whether the nonparty can more readily bear the costs; and (3) whether the litigation is of public importance." US Bank Nat. Ass'n v. PHL Variable Ins. Co., No. 12-CV-6811, 2012 WL 5395249,

---

[60]    Id. at 6.

at *4 (S.D.N.Y. Nov. 5, 2012).  Where, as here, the nonparty was involved in the underlying conduct giving rise to the litigation, courts consistently hold that cost-shifting is unwarranted.  See Nike, Inc. v. Wu, No. 13-CV-8012 (CM), 2020 WL 257475, at *14 (S.D.N.Y. Jan. 17, 2020) ("Nonparties may have an interest where they were involved in the underlying conduct giving rise to the litigation."); see also In re First Am. Corp., 184 F.R.D. 234, 242 (S.D.N.Y. 1998) ("Where a nonparty was 'substantially involved in the underlying transaction and could have anticipated that [the failed transaction would] reasonably spawn some litigation,' Tutor–Saliba [Corp. v. United States, 32 Fed. Cl. 609, 610 n. 5 (1995)], expenses should not be awarded.").  Moreover, as one of the largest creditors in the bankruptcy proceeding, Jefferies has a substantial interest in the outcome of the case.

Nor can Jefferies plausibly argue that it lacks the ability to bear the costs of compliance.  Courts have expressly rejected cost-shifting where, as here, the subpoenaed entity is a large financial institution with substantial resources.  See Nike, 2020 WL 257475, at *14 (denying cost-shifting request because respondent was a "large financial institution with billions of dollars in revenues and trillions of dollars in assets" and "in [a] better position to bear the purported $1.22 million cost of compliance").  Finally, the principal case Jefferies cites in support of the opposite conclusion, Anderson v. Steers, Sullivan, McNamar & Rogers, 998 F.2d 495, 496 (7th Cir. 1993), is inapposite.  In Anderson, the Seventh Circuit addressed cost-shifting in the context of a frivolous pro se lawsuit, not cost-shifting under Fed. R. Civ. P. 45.

In sum, Jefferies' unsupported "undue burden" objections, coupled with its refusal to identify what it will or will not produce, leave Petitioners with no alternative but to seek an order compelling compliance with the Subpoena.

## CONCLUSION

For the reasons set forth above, Patrick James and the Related Entities respectfully move the Court for an order (i) compelling Jefferies to comply with the subpoena duces tecum by no later than January 22, 2026, and (ii) such other and further relief the Court deems just and proper.

Respectfully submitted,

|  | QUINN EMANUEL URQUHART & SULLIVAN, LLP |
|---|---|
| Dated: January 6, 2026<br>New York, New York | By:  /s/ James C. Tecce |

James C. Tecce
Michael B. Carlinsky
Scott Hartman
Anil Makhijani
Reece Pelley
Mengzhou (Melissa) Fu
Grace Sullivan
295 Fifth Avenue
New York, New York 10016
Telephone: (212) 849-7000
jamestecce@quinnemanuel.com
michaelcarlinsky@quinnemanuel.com
scotthartman@quinnemanuel.com
anilmakhijani@quinnemanuel.com
reecepelley@quinnemanuel.com
melissafu@quinnemanuel.com
gracesullivan@quinnemanuel.com

*Attorneys for Petitioners Patrick James, The Patrick James Trust, Albion Realty LLC, Alester Technologies LLC, Battery Park Holdings LLC, Bond Street Asset Management LLC, Ignite Acquisition Holdings LLC, Larchmont LLC, and Pegasus Aviation, LLC*

## <u>CERTIFICATE OF WORD COUNT COMPLIANCE</u>

I, James C. Tecce,  an attorney duly admitted to practice before this Court, hereby certify pursuant to Local Civil Rule 7.1(c) that annexed Memorandum of Law was prepared using Microsoft Word and the document contains 8,447 words as calculated by the application's word-counting function, excluding the parts of the Memorandum of Law exempted by Local Civil Rule 7.1(c).

I certify under the penalty of perjury the foregoing statements are true and correct. Executed on this 6th day of January, 2026 in New York, New York.

*/s/ James C. Tecce*
James C. Tecce